Filed 3/3/16  In re I.M. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re I.M., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DORIS C.,<br><br>    Defendant and Appellant. | A144933<br><br>(Contra Costa County<br>Super. Ct. No. J08-01425) |

Doris C. (hereafter Guardian) appeals from orders on a Welfare and Institutions Code section 387[1] supplemental petition removing her great granddaughter I.M., born in January 2006, from her custody.  The petition was sustained after I.M. acted out sexually, and Guardian failed to inform the Bureau of a drive-by shooting at the home where she lived with I.M.

Guardian's briefs for the most part reargue the facts, which we cannot reweigh on appeal.  To the extent she argues legal issues, her contentions lack merit.  We affirm.

---

[1] Unless otherwise indicated, subsequent statutory references are to the Welfare and Institutions Code.

# I. RECORD

A. <u>Background</u>

In 2008, I.M.'s mother and father admitted allegations of a section 300 petition involving drug use. I.M. was adjudged a dependent child, and in August 2009 the Bureau recommended that reunification services to her parents be terminated. By that time I.M. was placed with Guardian. In January 2010, the court appointed Guardian as I.M.'s guardian, adopted a permanent plan of legal guardianship, and continued the dependency.

The case was continued into 2011 while I.M. applied for SSI benefits. In February 2012, the Bureau reported that I.M. had been prescribed medication for Attention Deficit Hyperactivity Disorder (ADHD). The Bureau recommended "maintaining the dependency in order to monitor [I.M's] placement as well as to continue to work with [Guardian] around other caregivers that may be able to provide a home for [I.M.] in the future.' The court followed the recommendation. In September 2012, I.M. was diagnosed with trichotillamania, a hair pulling disorder. The Bureau's October 2012 report stated that Guardian was providing [I.M.] a "stable and loving home," and the court adopted the Bureau's recommendation that the dependency be maintained "to continue to monitor [I.M.'s] placement."

In April and November 2013, the court followed the Bureau's recommendation and continued the guardianship plan and the dependency case. The Bureau's November 2013 report stated that I.M. "considers [Guardian] her mother and this placement her home."

In March 2014, the Bureau continued to recommend maintenance of the guardianship and dependency. The Bureau reported that Guardian had required little assistance from it since the last report. The guardianship was "clearly meeting the child's needs for stability, permanency, and mutual affection. [Guardian] is more than capable of meeting [I.M.'s] special emotional, academic, and behavioral needs." Bureau social worker Frazel had discussed terminating the case with Guardian on several occasions, but Guardian said "she does not feel comfortable with terminating the dependency at this time, as she feels that [I.M.] would benefit from the continued support and available

resources that continued CFS involvement can provide." The court adopted the Bureau's recommendation. In April 2014, I.M. was diagnosed with "intermittent explosive disorder." In September 2014, I.M. was diagnosed with "oppositional defiant disorder," as well as intermittent explosive disorder and ADHD.

The Bureau's September 2014 status review report stated that Guardian was devoted to I.M. and that they had a strong and loving bond. The September report, like the March report, stated that the Bureau would likely recommend termination of the dependency at the next status review hearing, but Guardian continued to want the dependency case maintained for the support and resources the Bureau could provide. "The social worker held a providers' meeting on August 19, 2014 to assess [I.M.'s] immediate needs and to provide a clear direction regarding the child's mental health needs. . . . [I.M.] needs an updated IEP [Individualized Educational Program], [to] be around other children in a specialized school setting and [to] be assessed for a psychological and possibly for a neuropsychological testing. The social worker has made a referral for Therapeutic Behavioral Services (TBS) for [I.M.] in the home and trauma focused Cognitive Behavioral Therapy (CBT) to teach coping skills and redirect behavior. The social worker has also made a referral to change [I.M.'s] psychiatrist back to Dr. Giri with whom she had a trusting relationship. The social worker also made a contact with the Special Education director, Dr. Kerri Mills, with Mt. Diablo to expedite the process of [I.M.'s] IEP." The Bureau recommended that I.M. be continued as a dependent child in Guardian's care, and the court followed the recommendation.

The September status review report stated that in "the last few months, [I.M.'s] behavior has escalated in a school setting. [I.M.] not only struggled to follow instructions at school but also did not meet her academic goals. . . . Sunrise school has reportedly been blamed for the child's escalated behavior." Guardian filed a caregiver information form dated September 16, attaching a letter she wrote explaining why she removed I.M. from Sunrise school. Other attachments included a letter from Cheryl Theis, a parent advocate with the Disability Rights Education and Defense Fund (DREDF), and an administrative complaint filed by DREDF against the California Department of

3

Education, alleging excessive use of restraint and seclusion against I.M. at Sunrise.  The complaint stated among other things that I.M. was placed in Sunset's " 'Intensive Classroom,' a multi-grade level classroom comprised of mostly older boys" in March 2014 because of "her 'escalating behaviors,' as documented at school in increasing behavioral incident emergency reports."

B. Detention

The Bureau filed a memorandum with the court for the next scheduled hearing on December 11, 2014.  When the case worker went to visit eight-year-old I.M. at school on November 6, I.M.'s teacher told her that I.M. approached a boy in her class on November 4 and said, " 'I want you to fuck me.'  The teacher also reported that [I.M.'s] body movements were sexually suggestive towards the boy.  When the boy ignored [I.M.], she showed him her middle finger and said, 'fuck off.' "

The memorandum stated that the school psychologist reported at an IEP meeting on November 14 that "[I.M.] had acted sexually inappropriately twice in the last few days.  One time, I.M. sucked on a long balloon and the second time, she was seen rubbing her pelvis against another boy in the play area.  The social worker asked [Guardian] if she knew about [I.M.'s] inappropriate behavior and if she had an opportunity to address it.  [Guardian] said, 'Yes, I know about it.  I talked to [I.M.] and it was handled.'  The social worker asked what was [I.M.'s] response to her behavior.  [Guardian] said, '[I.M.] must have learned that behavior from cartoons as she has a television in her room.'  [Guardian] also said, 'I know that [I.M.] learned a whole lot of bad things from Sunrise school,' and 'my son [D.C.] never did anything inappropriate in the home.'  The social worker asked why [Guardian] did not call her to discuss her concerns about [I.M.'s] behavior.  [Guardian] said that she did not know if she needed to do that and it was already handled.  The social worker reminded [Guardian] about the conversation she had with her in September 2014 when she asked her to call the social worker to inform about concerns regarding [I.M.]."

The September conversation between the social worker and Guardian was prompted by the social worker's review of police reports involving Guardian's adult

4

adopted son D.C. The memorandum stated that police were called to investigate a report of domestic violence by D.C. in September 2012, which occurred away from the home where he lived with Guardian and I.M. Then, on May 22, 2013, Guardian and D.C. called the police to report a shooting at their home. Several people heard multiple gunshots and a vehicle speed away. It appeared that eight shots were fired, and three bullets were recovered from the home's carport. Police believed that D.C. was the target of the shootings, and at the time Guardian said that "she too believed the shooting was intended to scare [D.C.]." She said that "her family was very upset over the incident and blamed [D.C.]. She said that the family confronted [D.C.] many times and were not able to get any additional information from him."

The memorandum continued: "The social worker informed [Guardian] that [D.C.] has a violent criminal history and he cannot stay in the same house where [I.M.] has been placed. [Guardian] said, 'Why are you against my son? I am not going to kick my kid out of my house.' . . . [T]he social worker asked [Guardian] about the May 2013 shooting incident and why did she not inform the department about it. [Guardian] said that she did not know she had to inform anyone about anything. [T]he social worker told [Guardian] that [I.M.] is a ward of court and she is placed in that home; therefore, [Guardian] is responsible for the safety of the child. . . . [Guardian] said, 'How do you know that the shooting was intended for [D.C.]?' The social worker reminded [Guardian] that [Guardian] herself advised the police officer that the shooting was intended for [D.C.]. [Guardian] said, 'Fine, I will contact my relatives and [D.C.] will be out by this weekend.' The social worker advised [Guardian] to call her and keep an open communication if anything else happened."

At the December 11 hearing, the court ordered that for her safety I.M. be removed from Guardian's home that day. I.M.'s counsel agreed with the court that the home was dangerous for I.M., adding: "At this point in time, given all the services that have been given to my client and the supportive services that have been brought into the home . . . I'm not sure that we are actually, as to my client, providing reasonable services to be

5

honest with you. [¶] I know we have thrown everything at her that we can, but it concerns me that she's still not safe despite everything that the department has done."

On December 15, the Bureau filed a supplemental petition recommending that I.M. be placed in foster care because the previous disposition had not effectively protected I.M. alleging that because: "The legal guardian neglected the child's needs by failing to report and exposing the child to dangerous situation (*sic*) as evidenced by: [¶] a) On or about May 22, 2013, gunshots were fired into the legal guardian's home and car. The legal guardian told the police that the shots were meant for her adult son, [D.C.], who she allowed to live in her home. . . . The guardian has been advised on October 3, 2014, by the social worker, to report any and all incidents that place the child at risk: [¶] a) On or about November 6, 2014, it was reported the child exhibited inappropriate sexural (*sic*) behavior in her school setting with (*sic*) Legal Guardian failed to report to the social worker. [¶] b) The Legal Guardian has not responded appropriately as evidence (*sic*) by: 'I have already talked to [I.M.]. It was handled.' '[I.M.] has learned from watching cartoons.' '[I.M.] puts everything in her mouth.' "

A contested detention hearing was held over several sessions. Social worker Vohra, who took over I.M.'s case for the Bureau in July or August of 2014, testified that several adult women were at Guardian's home when she took custody of I.M. on December 11. The women called Vohra a "devil" and a "home wrecker," and cursed at her in I.M.'s presence.[2] I.M. told Vohra that her aunts wanted her to cry and scream when she was taken away, but she did not want to. I.M. was quiet and calm after she left the house.

When Vohra spoke to I.M.'s teacher at the Floyd I. Marchus school on November 6 the teacher said that Guardian had been informed of the November 4 obscene

_____

[2] Emotions have run high in this case. At one hearing, the court repeatedly admonished Guardian's trial and appellate counsel to calm down and stop shouting. At another hearing, the court admonished Guardian to keep her facial expressions to herself. When the court announced the disposition, it noted that disability rights activist Theis, who was called as a witness for Guardian, appeared "just furious" with Vohra, and kept giving her dirty looks.

proposition incident. Marchus school psychologist Sorensen reported the balloon-sucking and pelvis-rubbing incidents at the IEP meeting on November 14. Vohra asked Guardian at the IEP meeting if she had an opportunity to discuss inappropriate sexual behavior with I.M., and Guardian said, "yes, I know about it. I talked to [I.M.] and it was handled." Guardian told Vohra she did not know whether she had to report the May 2013 shooting incident. However, Vohra said Guardian had been a foster parent for 15 or 16 years, and a foster parent would understand the need to report a drive-by shooting at her home.

I.M's counsel introduced an exhibit showing that police were called to Guardian's home over 20 times from April 2008 to March 2014. Vohra said that some of the incidents were of concern to the Bureau. In June 2008, police were dispatched to the home to look for a vehicle occupied by burglary suspects, and police found weapons including an assault rifle during a probation search. In October 2009, police responded to a report of a fight, and found I.M. in the home along with a 50-year-old woman holding three knives. The report for a contact in March 2010 states "needs to take s[] into custody for a 187," and "is with State Parole." In June, September, and November 2013, police investigated a woman who "just broke a glass and thinks that people are bothering her and messing with her teeth," was "talking nonsense about 'foulness' going on in her house," and was "flipping out in the house . . . yelling and threatening people." Vohra testified that Guardian did not inform the Bureau of any of the police contacts other than the one involving the woman with knives.

In May 2010, the bureau informed Guardian that one of her daughters could not live in the home due to her criminal history. In 2014, Guardian was told twice to remove D.C. from her home before he eventually moved out. I.M. volunteered to a foster parent that D.C. had done nothing wrong to her.

Asked about the services the Bureau was currently providing, Vohra said that she had made referrals through the county mental health department for therapeutic behavior services, wraparound services, a family partner, and a case manager. The family partner is "a support system for [Guardian]. They go home and provide services with wrap

services."  Wraparound services are child and mental health services provided by county staff, who "go into the home a couple of times a week, and they provide additional support, and they help hold meetings in the home where the caretaker and the child lives."  I.M. continued to receive psychotherapy, and Vohra referred her for a comprehensive psychological assessment for possible post-traumatic stress disorder.

Vohra said the therapist reported that after I.M. was removed from Guardian's home "she was talking like a mature person, and she was not running around, provoking him the way she did before in the previous meetings."  He said I.M. appeared to be "a much older child," and they had "very clear conversations for the first time."  However, Vohra said I.M. was taken to the emergency room because she had pulled out so much of her hair that she was essentially bald.  The therapist attributed this behavior to anxiety caused by I.M.'s removal from Guardian's home, and by the ADHD medication he had prescribed for her.  I.M. told Vohra she wanted to go home to Guardian.

Therapeutic behavioral social worker Rachel Benson testified that she discussed the obscene proposition incident with Guardian in the week of November 4.  Guardian testified that she knew of this incident before the November 14 IEP meeting, but learned at that meeting of the balloon sucking and pelvis thrusting incidents.  Guardian said she told Vohra that she had addressed the sexual proposition because she had a meeting the day it happened with Benson and others who were providing wraparound services.  Guardian denied telling Vohra that I.M. learned about sex from watching cartoons.  She did tell Vohra that I.M. puts everything in her mouth, "[t]oys, pencils, even her hair."

Guardian denied telling Vohra or the police that she thought the bullets fired at the drive-by shooting were meant for D.C.  Guardian said the woman wielding three knives in the home in 2009 was a daughter of hers with "a mental problem."  The daughter was visiting, and "had one of those episodes where she thought someone was bothering her."  Guardian said the police came to the home in 2008 or 2009 with a warrant for one of her grandsons who was on probation and had missed a court date.  They kicked open a locked bedroom door, returned with a search warrant, and found a hypodermic needle

under a mattress and a dismantled sawed-off shotgun. Guardian was asked, and stipulated, to surrender her foster parent license as a result of this incident.

Guardian testified that Vohra told her I.M. had pulled her pants down at her current foster home and told another foster child, "you would be good for my cousin [D.C.]."

Benson testified that she had visited Guardian's home seven to ten times since late September or October of 2014, and had never seen anything that concerned her. Mary Pult, I.M.'s Court Appointed Special Advocate from August 2012 to May 2014, testified that she saw I.M. around two times a month during that period and never witnessed any inappropriate behavior by adults in the home. Pult saw D.C. "as kind of a big brother in the way he took care of [I.M.], in the way he looked out for her." She was not aware of the drive-by shooting or any of the police contacts. Theis testified that the IEP meeting on November 14 lasted one and a half to two hours and that Vohra left the meeting 20 to 30 minutes early.

The Bureau and I.M. argued for I.M.'s detention, and Guardian argued for I.M.'s return to her care. The court found by clear and convincing evidence that detention of I.M. outside Guardian's home was necessary for her physical and emotional well-being. The court found Guardian was not a credible witness in various respects, and did not believe "to this day that we know all the things this child was exposed to in the home." The court ordered that Guardian have supervised visits with I.M.

C. Jurisdiction and Disposition

The Bureau's March 2015 jurisdiction and disposition report stated that I.M. was in her third foster placement after removal from Guardian's custody. After I.M. exposed herself and made a sexually suggestive comment regarding D.C. at her second home, the Bureau had to make over 110 telephone inquiries to find a suitable home. I.M. was receiving therapy from three providers, and supportive wraparound services from the county mental health department. The Bureau had referred I.M. for a psychological assessment, and referred Guardian to "individual counseling which would include age

9

and developmentally appropriate parenting." The Bureau scheduled and supervised visitation between Guardian and I.M.

The Bureau wrote: "It is certain that [I.M.] has been exposed to some kind of inappropriate sexual behavior while living in her home with [Guardian]. Recently [I.M.] disclosed to another child that she has smoked pot and different flavors of hookah at her aunt's home. She has made statements to several people in the past that her family has instructed her not to trust the social worker and not to disclose anything." The Bureau recommended that the allegations of the supplemental petition be sustained, that I.M. be continued as a dependent child, that I.M. not be returned to Guardian's home, and that Guardian receive reunification services.

The issue of jurisdiction was submitted on March 23 on the evidence presented at the detention hearings, and the Bureau's March 2015 report. The court found the allegations of the supplemental petition to be true, and proceeded with a hearing on the disposition.

Vohra testified that the Bureau had provided two of the three therapists I.M. was seeing, and that her school provided the other. The Bureau also obtained "the wraparound services and parent's partner." The Bureau referred Guardian for therapy and parenting education on March 13. I.M. had just turned nine, and had stopped pulling out her hair.

School psychologist Sorensen testified for Guardian that I.M. was making "remarkable" educational, behavioral, and emotional progress before she was detained, but only "inconsistent" progress ever since. She was having more difficulty academically and had become very guarded emotionally. Sorensen was aware of the balloon sucking incident, which looked "sexual in nature," and the hip thrusting incident, which he said was a nonsexual response to a boy who was harassing her. He believed these incidents "were being blown out of proportion," and were not "behaviors that would be something out of the broad range . . . of normal for a young child." He was not aware that I.M. had ever told another student "I want you to fuck me."

10

Guardian introduced a January 7, 2015 declaration of Lori DePole, a volunteer with EMQ FamiliesFirst, Inc., a non-profit organization, who had tutored I.M. in reading beginning in May 2014. DePole stated that "[Guardian] has timely brought I.M. to all of her 63 appointments with me. [I.M.] is always appropriately dressed for her age and well groomed. She appears happy, talkative and engaged. Since being removed from Sunrise, her behavior and ability to focus during our sessions together has improved dramatically. She has stopped exhibiting some of her early behaviors such as spitting, damaging property and wandering the office. I have noticed that [I.M.] has a tendency to put items in her mouth . . . including paper, dry erase markers, coins/dollar bills, and toys/game pieces." DePole never saw I.M. exhibit sexual behavior or heard her make sexual comments. In DePole's opinion, Guardian had "done a fabulous job in raising [I.M.]."

The court decided to follow the Bureau's recommendations, and explained its reasoning in detail. The court found Vohra to be a conscientious social worker and a very credible witness. Citing among other things the drive-by shooting, the number of police contacts, the presence of weapons, and the incident with the knives, the court said, "There was just chaos in [Guardian's] home. And . . . I think we're at the tip of the iceberg of what went on in this home." The court determined that Guardian "flat-out lied" in court or to the police about the shooting incident, and had been "evasive, secretive, and not forthcoming" in her testimony  The court noted the evidence that I.M. interacted more maturely with her psychiatrist after she was removed from Guardian's care. The court believed I.M.'s denial that D.C. harmed her showed "she was coached or [D.C.] did do something wrong." The court found Theis biased in favor of Guardian, and questioned Sorensen's competence. The court ordered reunification services and visitation for Guardian, and set review hearings for June 30 and September 1.

## II. DISCUSSION

### A. Reasonable Services

Guardian argues in her opening brief that "reasonable services were not provided to prevent removal from the guardian when the supplemental W&I 387 petition was filed." (Capitalization omitted.) Guardian writes: "What reasonable services were

11

provided to prevent removal prior to the request for detention as a result of the filing of the W&I 387 petition?  None."  Although the petition was filed after I.M. was removed from Guardian's custody, these contentions imply that Guardian is contesting the sufficiency of services prior to removal.  This implication is confirmed in Guardian's reply brief, where she states:  "The issue is pre-removal services, not post-removal services . . . ."

To the extent Guardian is arguing that services must be provided before a child is removed from the custody of a parent or guardian, the argument is plainly untenable. Before taking a minor into custody, the social worker need only consider whether there are "any reasonable services *available*" to eliminate the need for removal.  (§ 306, subd. (b)(1) [italics added].)  Similarly, at the detention hearing, the court must consider "whether there are available services that would prevent the need for further detention." (§ 319, subd. (d)(1).)  Children may need to be detained before any services are provided. Guardian cites no authority suggesting that this reality is any different when a child is removed pursuant to a supplemental, rather than an initial, petition.

Assuming for the sake of argument that reasonable services were required before I.M.'s removal because a dependency case was ongoing, the evidence supported an implied finding that such services were provided.   (See, e.g., *In re Julie M.* (1999) 69 Cal.App.4th 41, 46 [reasonable services findings are reviewed for substantial evidence].) As I.M.'s counsel put it at the removal hearing in questioning whether I.M. had received reasonable services, "I know we have thrown everything at her that we can."  According to the Bureau's September 2014 report, the social worker arranged I.M.'s psychiatric care, referred her for therapeutic and cognitive behavioral therapy, coordinated the efforts of her mental health providers, and assisted with her education.  This was substantial evidence of the provision of reasonable services.  Guardian recognized the value of those services at the time, because she resisted the Bureau's plans to terminate the dependency.

Having framed the issue as one involving the adequacy of pre-removal services, Guardian cites *In re Javier G.* (2006) 137 Cal.App.4th 453, 463, to the effect that the Bureau had to prove at the section 387 disposition hearing that reasonable efforts were

made to eliminate the need for I.M.'s removal. If Guardian is arguing that post-removal services were inadequate, that contention also fails. Vohra testified that those services included providing therapists for I.M., referring her for a psychological assessment, and referrals for therapeutic behavior services, wraparound services, a family partner, and a case manager. According to the disposition report, those services also included scheduling and supervision of visits between Guardian and I.M. and considerable efforts to find I.M. a suitable foster home. The court's finding at disposition that reasonable services had been provided was supported by substantial evidence.

B. Jurisdictional Findings

Guardian contends that the Bureau "failed to prove the allegations contained in the supplemental petition." We review the court's jurisdictional findings for substantial evidence, and view the evidence in the light most favorable to the findings. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461 (*S.O.*).)

The first set of allegations involved the drive-by shooting. The petition alleged that shots were fired into Guardian's home and car, that Guardian told police the shots were meant for D.C. who was then living in the home, and that Guardian failed to apprise the Bureau of the incident. The petition alleged that Guardian thereby neglected I.M.'s needs and exposed her to danger. While it was not proven that shots were fired into Guardian's home, testimony showed that gunfire hit a tire of Guardian's car, and the carport ten to 15 feet from the house. There was conflicting evidence as to whether Guardian told police that D.C. was the intended target, and she claims that she "had no reason to believe that any shots were meant for anyone living in the house." But the court determined that she lied about the shooting, and we presume the court determined she told police D.C. was the target. (*S.O.*, *supra*, 103 Cal.App.4th at p. 461.) Moreover, there was no dispute that Guardian neglected to report the incident to the Bureau. The factual allegations were supported by the evidence, and the court could reasonably find from those facts that Guardian had neglected I.M. and exposed her to danger.

The second set of allegations involved I.M.'s November 4 obscene proposition to a classmate. The petition alleged that Guardian failed to report the incident to the Bureau

13

and did not appropriately respond to it. Guardian appears to contend that she could not be faulted for failing to report the incident because she did not learn of I.M.'s sexual behavior at the school until the November 14 IEP meeting or the day before it. This claim ignores Vohra's and Benson's testimony, which we presume the court believed (*S.O.*, *supra*, 103 Cal.App.4th at p. 461), that Vohra was told by I.M.'s teacher on November 6 that Guardian had been informed of the incident, and Benson discussed the incident with Guardian the week of November 4. The petition alleged that Guardian responded inappropriately to the incident by saying: "I have already talked to [I.M.]. It was handled." "[I.M.] learned from watching cartoons." "[I.M.] puts everything in her mouth." Guardian denied the statement about cartoons, but admitted the other two statements. Whether the statements were inappropriate responses to I.M.'s sexualized behavior was a judgment call for the trial court. Entirely apart from these statements, failure to report the November 4 incident could reasonably be found to establish that I.M. was at risk in Guardian's care.

We reject Guardian's challenge to the jurisdictional findings.

C.  Evidentiary Issues

Guardian contends the court erred when it overruled her objections to Vohra's testimony that one of I.M.'s foster parents reported that I.M. told another foster child that she had smoked marijuana with D.C. as hearsay and without foundation  Guardian argues this evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative because Vohra did not investigate the veracity of the report.

This argument is forfeited because Guardian did not object to admission of the evidence on Evidence Code section 352 grounds. (Evid. Code, § 353, subd. (a); *People v. Kennedy* (2005) 36 Cal.4th 595, 611–612, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Also, any error in admitting this evidence was harmless because there is no reasonable prospect, given all the other evidence, that a different ruling could have changed the court's decision. (Evid. Code, § 353, subd. (b).)

Guardian argues that Vohra's assertion in the disposition report "[i]t is certain that [I.M.] has been exposed to some kind of inappropriate sexual behavior while living in her

home with [Guardian]" is "outrageous" and should have been stricken under Evidence Code section 352. Guardian does not identify anywhere in the record when she objected to consideration of this statement on Evidence Code section 352 or other grounds. Accordingly, this argument too is forfeited. (Evid. Code, § 353, subd. (a).) Exposure to inappropriate sexual behavior in Guardian's home was at least plausible from the evidence, and the court was entitled to give Vohra's opinion whatever weight it believed the opinion deserved.

D. Other Arguments

Guardian's other contentions merely reargue the facts, which we do not reweigh on appeal. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13, disapproved on another ground in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12.) Guardian writes, for example: "At the time of the conclusion of the Disposition hearing there was no substantial danger to the child's physical or emotional well-being. [¶] First, [D.C.], [Guardian's] adopted son had already moved out of the guardian's house. . . . Second, the child's emotional well-being has been harmed due to her removal from the Guardian's care [as evidenced by her extreme hair-pulling]. . . . Last, prior to removal, all reports indicated that the Guardian was very loving and appropriate with minor and a great care giver." Guardian also expounds on her efforts to further I.M.'s education.

Notwithstanding the considerations Guardian cites, the court had good reasons, which it articulated in detail, to conclude that I.M. was not safe in Guardian's care. At best for Guardian, the situation in this case was one about which reasonable minds could differ. In such circumstances, we have no basis to second guess the juvenile court's determination.

## III. DISPOSITION

The orders on the section 387 petition are affirmed.

                                 _____\
                                 Siggins, J.

We concur:


_____\
McGuiness, P.J.


_____\
Jenkins, J.


*In re I.M.*, A144933